## MARR v. UNITED STATES.[*]

(Circuit Court of Appeals, Eighth Circuit. September 14, 1925. Rehearing Denied December 2, 1925.)

No. 6804.

1. **Criminal law ⟊1091(11)—Matters to be embodied in bill of exceptions limited.**

Only such parts of trial proceedings as bear on claimed errors of law should be brought into the record by bill of exceptions, and rarely can there be any reason for embodying questions to witnesses.

2. **Post office ⟊49—Facts and inferences held to support conviction for using mails in execution of fraudulent scheme.**

Facts and reasonable inferences therefrom held to support conviction for devising a fraudulent scheme and using post office in its execution.

3. **Post office ⟊35—Letter held direct aid in inducing public to buy certificates, in accordance with fraudulent scheme.**

Letter sent by defendant held a direct aid in inducing the public to purchase certificates in oil trust in accordance with fraudulent scheme,

4. **Criminal law ⟊283—Proposition that all evidence before grand jury was obtained by unlawful seizure held not supported by facts.**

Proposition, on which plea in abatement was made, that all the evidence submitted to the grand jury consisted of papers illegally seized and evidence obtained through informa-

Certiorari denied 46 S. Ct. 210, 70 L. Ed. —.

tion suggested thereby held, in view of testimony taken on hearing of the plea, not supported by the facts.

In Error to the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

Morton Howard Marr, otherwise called Pat Marr, was convicted of using the post office in the execution of a fraudulent scheme, and brings error. Affirmed.

W. T. Saye, of El Dorado, Ark., and W. H. Martin, of Hot Springs, Ark. (J. N. Saye, J. K. Mahony, and H. S. Yocum, all of El Dorado, Ark., on the brief), for plaintiff in error.

James D. Shaver, Sp. Asst. U. S. Atty., of Texarkana, Ark., and H. L. Arterberry, Sp. Asst. Atty. Gen. (S. S. Langley, U. S. Atty., of Ft. Smith, Ark., and Sylvester R. Rush, Sp. Asst. Atty. Gen., on the brief), for the United States.

Before LEWIS, Circuit Judge, and VAN VALKENBURGH and FARIS, District Judges.

LEWIS, Circuit Judge. [1] Plaintiff in error, herein referred to as defendant or as Marr, was convicted on the first count of an indictment which charged him and others with devising a fraudulent scheme and using the post office in its execution. Penal Code, § 215 (Comp. St. § 10385). The record presented to us contains 2,441 pages, the greater part of which is a transcript of the proceedings during the progress of the trial. Questions to witnesses and their answers are set out in full, also many colloquies between counsel and between court and counsel. All of this is embodied in a so-called bill of exceptions extending from page 102 to page 2418 of the printed record. As said in Linn v. United States, 251 F. 476, 483, 163 C. C. A. 470, the so-called bill of exceptions in this case is such in name only. We are painfully aware of the fact that such a practice has become too common. It is expensive to litigants and burdensome to the court. It ought not to be permitted. Only such parts of the trial proceedings which bear on the claimed errors of law committed below should be brought into the record by a bill of exceptions. Everything else is foreign to the issues here and confusing. There can rarely be any reason given for embodying questions put to witnesses; and this is true even in cases, which sometimes occur, wherein it can be reasonably contended that the verdict is wholly without support, hence all testimony must be considered. That, confessedly, is

not this case. Notwithstanding this, we have spent many days reading this record, in an effort to find what bears on the errors assigned. The assignments·relied upon will be taken up after a statement of the case.

On July 7, 1922, defendant executed a declaration of voluntary trust, and on the same day filed the same in the proper office of Union County, Arkansas, in which records of deeds for that county are kept. This declaration of trust is entitled, "The Trust Estate, The Double Barrel Gusher Syndicate." The defendant therein declared that he was about to take title to certain oil and gas leases as trustee, that he would hold those leases and all other. property, real and personal, which might be conveyed or transferred to him as trustee thereunder, upon the trust thereinafter declared, that the beneficiaries in the trust estate would be the persons who might subscribe for and pay for certificates of $10 each to be issued by the trustee, but the declaration did not state what property or what leases the trustee intended or expected to acquire for the trust estate. The form of these certificates to be issued was set out in the declaration. .The defendant reserved to himself unrestricted control, management and disposition; and that he or his successor in trust might terminate the trust estate by merger or reorganization in any manner or form whatsoever. It gave him power to manage and control the property of the trust estate according to his own judgment, and prohibited the holders of certificates that might be issued any participation therein. It provided that he might expend any portion of the trust funds or profits necessary in carrying out the trust, that he would keep all business transactions as trustee in record form in detail, and that he would be entitled to 25 per cent. of the profits and of the corpus of the trust estate, the certificate holders would be entitled to share prorata the remainder thereof. Defendant at once entered upon a campaign to induce the general public to take and pay for certificates to be issued by him. This was carried on by circular letters sent through the mails and newspaper advertisements. On August 19, 1922, he sent through the United States mails from El Dorado; Arkansas, a circular letter in which he said he had organized the Pat Marr Double Barrel Gusher Syndicate, that it had no capitalization, that it was operated on ·the actual cost plan, that he was out to raise only $32,400, with which he would drill oil wells in section 29 of the El Dorado field, that .he guaranteed that both of these wells would be gushers that would spout oil over the crown block, that he guaranteed to pay every person who invested with him 400 per cent. in dividends, that he expected to drill 20 gushers and to pay 4,000 per cent. instead of 400 per cent., that he had done this before many times and was out to do it again,· that he was an oil man whose merit had been tried and proven in every oil field in the Great ·Southwest, that he guaranteed two gusher wells and 400 per cent. in dividends. His advertising campaign resulted in his selling certificates to the amount of more than $177,000.

On September 23, 1922, he filed another declaration of trust identical in form with the one filed on July 7th preceding, which he called "Pat Marr's Camden Syndicate No. 2." This was followed up by a campaign of advertisement through newspapers and circular letters for subscribers for certificates, and he received something more than $255,000, for which he issued certificates of $10 each in Camden Syndicate No. 2. On December 11, 1922, he filed another declaration like the two preceding, wherein he created another trust estate which he called "The Pat Marr Company." This was immediately followed up with another newspaper advertising and circular letter campaign, and he admittedly received $1,391,000 (the district attorney says $1,960,000), for which he issued certificates of $10 each in The Pat Marr Company. He acquired oil leases and lands supposed to be valuable for oil deposits and proceeded to develop them. Some of them were of great value and some were not. ·On October 28, 1922, he declared another trust in the same form as those we have considered, under the title, "Pat Marr Oil Company," but it does not appear that he sold certificates in that. He also organized and controlled several corporations, among them Marr Oil Corporation, under the laws of Maryland, with a capital stock of 1,500,000 shares of no par value, 25,000 thereof to be known as Class A, which were to manage and control the corporation, the remainder as. Class B. The record shows many assignments of leases and conveyances, some by Marr. as trustee to named persons, some by ·Marr as trustee to the corporations which he organized and controlled, and some by Marr as trustee to himself as trustee, but not indicating for what trust he was acting either as grantor or grantee; and there is no explanation in that respect. On November 27, 1922, acting as trustee for Pat Marr's Camden Syndicate No. 2, he transferred to the Texas Company, a corporation, leases covering certain lands for a consideration of $250,000. He also

transferred to that company certain leases belonging to the Double Barrel Gusher Syndicate for $250,000, and thereafter he paid to the certificate holders in those two syndicates the sums which they had given in purchase of their certificates—to the certificate holders in the Double Barrel Gusher Syndicate $177,000 plus, and to those in the Camden Syndicate No. 2 $255,000 plus, as shown by the books kept for those syndicates. No money was ever paid to any other certificate holder. These payments were made in May, 1923, and each of those concerns was closed out as of the 31st of that month. The books did not show that either of them had any remaining assets, except a balance of $19,000 standing to the credit of one and $26,000 to the credit of the other. They had each produced some oil. On November 27, 1922, Pat Marr as trustee (without stating for whom he was trustee) transferred to himself as trustee for Pat Marr Oil Company a large number of leases on lands in Union County, Arkansas, and on the same day Pat Marr Oil Company, by Pat Marr trustee, transferred those same leases to the Texas Company for a consideration of $1,000,000, half of which was paid in cash at the time and the other half in twelve notes of equal amount, which the evidence shows were discounted by Marr. The Marr Oil Corporation of Delaware was organized on May 8, 1923, and on the 19th of that month Marr as trustee for the Double Barrel Gusher Syndicate conveyed to that corporation for a named consideration of $10 any and all property, real, personal and mixed, wheresoever situate, that then belonged to that syndicate, and the grantee agreed to issue and deliver to the grantor 1,750 shares of Class A voting stock in that corporation and 21,917 shares of Class B non-voting stock. On the same day, May 19, as trustee for the Camden Syndicate No. 2, he made a like conveyance to that corporation for a named consideration of $10, and the grantee further agreed to issue to the grantor 2,525 shares of its Class A voting stock and 31,535 shares of its Class B non-voting stock. On the same day Marr as trustee for the Pat Marr Company conveyed to that corporation all of the property of that trust estate wheresoever situate, and assigned to it current assets consisting of cash, bills receivable, etc., amounting to several hundred thousand dollars. The grantee also assumed and agreed to pay an indebtedness of $472,000 to the Western Oil Company, a corporation controlled by Marr, also taxes and accounts payable to the amount of $112,000. The grantee also agreed

to issue to the grantor 20,725 shares of its Class A voting stock and 259,275 shares of its Class B non-voting stock. It appears to have been the purpose of Marr to distribute to the certificate holders in the three trust syndicate shares of Class B stock in the Marr Oil Corporation in lieu of the certificates which they held in those trust estates. Shortly after the transfers to the Marr Oil Corporation above-noted, Marr disposed of all of his interest therein. The three trust estates were loosely planned. In neither did the declaration of trust specify or indicate in any way what properties should belong to them or either of them; nor how that should later be made to appear. It was left wholly with Marr. That did not affect his interest, because he was to have the same percentage in each, but it was of vital interest to the certificate holders.

[2] It may be conceded that the facts that have been stated, standing alone, do not prove a fraudulent scheme. All may have been done with an honest intent, though carelessly conducted. But the indictment returned by the grand jury on December 12, 1923, charged that Marr and his associates, named in the indictment, devised a fraudulent scheme in organizing the four trust estates and the corporations, all named in the indictment, for the purpose of obtaining the moneys of those who could be induced to pay for certificates in said trust estates, that a part of said fraudulent scheme was to take many of the leases in the name of Marr as trustee without designating what trust estate or what company they were held for, and in this way it was intended to confuse, conceal and hide from those who might purchase certificates in the trust estate the properties that respectively belonged to those estates, that some of the corporations were organized to be used for the purpose of aiding the defendants in concealing from the certificate holders the properties that would belong to the separate trust estates, and thereby the defendants would be enabled and were enabled to convert to their own use and benefit properties of the trust estates. The indictment then alleges at length the false representations and pretenses as a part of the scheme which the defendants intended to make and did make for the purpose of inducing purchase of certificates in the trust estates. One of these false representations, established by the proof, was that defendants, through circular letters and advertisements, stated that on September 7, 1922, Thurlkill Well No. 1 for the Double Barrel Gusher Syndicate had brought in a gusher

flowing over the crown block, producing at the rate of 2,400 barrels of oil per day, that it filled two 250-barrel storage tanks in five hours, that it then filled a large concrete reservoir and the well was then shut in. There is uncontradicted evidence that this well was not drilled in until after September 7th, and it was at all times thereafter a very small producer of oil. It was never a "gusher." Its maximum production was about 20 barrels per day. A witness who had to do with the drilling of this well testified that he got oil elsewhere and threw it over the drilling structure on the surface for the purpose of inducing the belief that it had come in as a gusher, and that he was caused to do this by Marr. Other false and many extravagant representations and promises found in circulars and advertisements are alleged to have been an intended part of the original scheme. They consist of representations that Marr had had long and successful experience in the oil business, his guaranties of production and the payment of dividends, his representations that the payments back to certificate holders in the Double Barrel Gusher Syndicate and the Camden Syndicate No. 2 of the amounts that they had paid for their certificates was a 100 per cent. dividend, when in fact it was a payment out of and a depletion of the assets of those syndicates, and that those representations were made for the purpose of inducing the certificate holders to reinvest the money so paid them in certificates of the Pat Marr Company, his third trust estate. Marr employed the Moore Advertising Agency of Fort Worth, Texas, to write his circular letters and advertising material. He insisted that it be unrestricted in its representations and promises and approved what they did. They contained false statements of material facts as well as unreasonable representations and promises of future development. The surprising thing to us is there were so many gullible people who had in hand the great sums that he induced them to contribute. As said by a great Judge who was a member of the Supreme Court of Missouri for many years, their powers of deglutition seem to have rivaled those of the great fish off the coast of Tarshish. It is sufficient to say, without further review of the facts, that they and the reasonable inferences to be drawn from them support the verdict.

[3] The indictment was attacked by demurrer, which was overruled. It is argued that this was error, because the letter set out in the first count and alleged to have been written and put in the United States mails by Marr at El Dorado, Arkansas, on October 13, 1923, addressed to James Grant, Huntington, Ark., shows on its face that it was not so deposited in the mails for the purpose of executing the scheme or attempting to do so. This letter was in response to a letter from Grant, and it appears from Marr's letter, set out in the indictment, that Grant had sent to Marr a check in payment for certificates in Camden Syndicate No. 2. Marr says in his letter to Grant that he is not allowed to accept any money from Arkansas unless he would first have all of his properties examined by bank commissioners. He then says:

"If you will send your check to Howard R. Ferrell, 1609 First National Bank Building, Detroit, Michigan, he will be glad to issue you units in the Camden Syndicate No. 2 which will be just as good as if you had received them direct from me. Yours very truly, Pat Marr."

Thereupon Grant sent a check as directed by Marr to Ferrell and received from Ferrell certificates in Camden Syndicate No. 2. There was evidence of co-operation between Marr and Ferrell under a prior arrangement, and we think it apparent that this letter was an aid in execution of the fraudulent scheme charged. It was a direct aid in inducing the public, as charged, to purchase trust certificates. It more than measured up to the requirements of the law. Stewart v. United States (C. C. A.) 300 F. 769, 775.

[4] The point most strongly pressed in behalf of defendant is that the court erred in overruling his plea in abatement, because the evidence submitted to the grand jury was obtained in violation of the Fourth and Fifth Amendments to the Constitution; and also because the court erred in admitting in evidence at the trial, over objection, testimony of some of the facts so ascertained. On August 30, 1923, a United States Commissioner issued a search warrant directed to the Marshal for the Western District of Arkansas, commanding him to enter what was known as the Pat Marr Building in El Dorado, Arkansas, and to there search for and seize the records, books and advertising matter of the trust estates that have been named, and of the several corporations, naming them, which, as heretofore said, were organized and controlled by Marr. This warrant was issued on the affidavit of post office inspectors Ross and Thompson, which set forth that defendant and two other named persons had formed a scheme to defraud and to obtain from James Grant of Huntington, Ark., and from many other persons, by

false and fraudulent pretenses, their moneys, that in execution of that scheme they had been sending and were then sending through United States post office pamphlets, circulars and letters, one of the said letters being that of October 13, 1922, addressed to James Grant of Huntington, Ark., and deposited in the mails at El Dorado, Ark. The warrant was not served until September 5th. On that day the Marshal, with assistants, seized in the building named and carried away seven mail sacks of books, records and copies of circular letters and advertising matter. At that time defendant had disposed of all of his interest in the companies named and in the trust estates, but at the request of the then officers of the Marr Oil Corporation he still occupied an office in the building and was continuing to some extent his supervision. On the same day that the search was made he was arrested on a charge of devising a scheme to defraud and using the post office service in execution thereof. He gave bail for his appearance. Steps were at once taken in his behalf to obtain from the District Judge an order for the return of all of the papers, records and documents seized. They were retained by the inspectors and accountant from the Department of Justice for about two and a half months before the application for a return was finally disposed of, when the order was granted. When they were returned a part of them that belonged to the Marr Oil Corporation was receipted for by one of its officers, but the greater part was receipted for by defendant. After the indictment was found the plea in abatement thereto set up that the only testimony submitted to the grand jury was the seized records and papers, and evidence based on inquiries and investigations made because of information gained from an examination of the seized records and papers. The district attorney joined issue on the plea and evidence was taken, and thereupon the court overruled the plea in abatement. We think the ruling was right. Post office inspectors testified that they and other inspectors had been at work on the case for several months prior to the issuance of the search warrant, that they had been in communication with and had interviewed many certificate holders in the trust estates and had received through them the circular letters and had seen theretofore much of the advertising, that some of them had theretofore interviewed defendant and as a result of that interview obtained much

of the testimony that was submitted to the grand jury, that none of the records, documents and papers seized was used before the grand jury and that they gave no testimony based on facts which they learned from that source, that they already knew those facts, that the purpose of the seizure was to have an accounting made of the different trust estates and corporations, that an accountant found them insufficient for that purpose and no further use was made of them. The district attorney who had charge of the investigation made by the grand jury testified in support of the evidence given by the inspectors. We considered this subject in Anderson v. United States, 273 F. 20. The contention is without merit.

Of course, we do not intend an expression of approval of the search and seizure. We only mean to say the facts do not support the proposition relied on. The other contention noted above is based on a ruling of the court permitting two witnesses from the Moore Advertising Agency to testify at the trial over objection. It is claimed that the procurement of these two witnesses by the prosecution and their testimony was based on information gained by post office inspectors on their examination of the seized records and papers. Again the district attorney joined issue and testimony was taken. We think it sufficient to say that on the facts the motion was properly overruled and the evidence of these two witnesses admitted. Other rulings of the court in the admission and exclusion of evidence are challenged as error. They have been considered and we think complaints of those rulings are without merit. None of them were prejudicial. An exception was saved to one brief comment of the court in its instructions to the jury. It is based on counsel's claim as to its meaning and probable effect on the minds of the jury. We think the remark of the court cannot be given the meaning attributed to it by counsel, nor could it have the prejudicial effect which they claim. In view of the testimony in the case we regard it as a proper comment. There were also exceptions to the court's refusal to instruct as requested by counsel. The instructions that were given covered fully the issues in the case, and were unusually clear and fair to both prosecution and defense. In them every applicable principle of law to the charge in the indictment and the evidence was stated.

We have found no reversible error, and the judgment of conviction is affirmed.