## STUNZ v. UNITED STATES.*

Circuit Court of Appeals, Eighth Circuit.
July 2, 1928.

No. 8006.

1. **Criminal law ☞867—Denial of motions to discharge jury because of newspaper articles published during trial for using mails to defraud by selling medical preparation held not abuse of discretion.**

Denial of defendants' motions to discharge jury on account of newspaper articles published during trial of prosecution for using mails to defraud by selling a medical preparation, which articles purported to outline government's case, methods employed in gathering evidence, and quoted extensively from government's opening statement, only testimony printed verbatim being a reproduction of advertisements admittedly carried by defendants in various newspapers, *held* not abuse of discretion, where court instructed jury to disregard such articles, and jury was not shown to have been influenced thereby.

2. **Criminal law ☞867—Motions to discharge jury because of newspaper articles published during trial are within trial court's sound discretion.**

Motions to discharge jury on account of publication of newspaper articles dealing with the case during course of trial are addressed to the sound discretion of the trial court.

3. **Post office ☞49(5)—Government held improperly permitted to show that defendants derived unusually large profits from scheme to defraud by use of mails by selling medical preparation.**

In prosecution for using mails to defraud by sale of medical preparation, government was improperly permitted to show that defendants had derived unusually large profits from the scheme, elements of the crime being the fraudulent scheme, intent to defraud, and use of mails; questions of pecuniary loss or profit, success or failure, or whether any one was or could actually be defrauded, not being material issues.

4. **Criminal law ☞484—Questions calling for expert opinion testimony held properly permitted to be as general as defendants' alleged fraudulent representations.**

Where questions calling for opinions of medical experts, in prosecution for use of mails in scheme to defraud by sale of medical preparation, were based on specific representations actually made by defendants, which representations were also very general, in not taking into account any possible mental or physical differences of potential customers, it was proper to permit the questions and answers to be as general as the representations.

5. **Post office ☞49(5)—Evidence admissible to establish fraudulent scheme involving use of mails may be extensive, and rests largely in trial judge's discretion.**

Evidence admissible to establish scheme to defraud by using mails may be extensive in scope, and rests largely in the discretion of the trial judge.

6. **Post office ☞49(11)—Conviction for using mails to defraud by selling medical remedy is justified, without proof preparation is worthless, if representations concerning it were false.**

If jury is convinced of the falsity of defendant's representations made through the mails concerning an alleged medical remedy, a conviction is justified, without proof that the article in question is worthless as a cure for disease.

7. **Post office ☞49(11)—Conviction for using mails to defraud by selling medical preparation must rest on more than conflicting opinion evidence.**

Conviction for using mails to defraud by selling medical preparation must be bottomed on something more than conflicting expert opinion evidence.

8. **Post office ☞49(11)—Evidence held to warrant conviction for using mails to defraud by selling medical preparation to restore sexual vigor.**

Evidence *held* to warrant conviction for using mails to defraud by selling medical preparation falsely represented to restore sexual vigor to men over 60 years of age, with knowledge of falsity thereof, or as made in reckless disregard as to whether such representations were true or false.

9. **Post office ☞35(11)—Fraud or deception, to justify conviction for using mails to defraud, may be by implications, as well as by express words.**

Fraud or deception, to justify conviction for using mails to defraud, may be by implications reasonably derived from representations by the reader, as well as by express words.

10. **Post office ☞35(11)—Use of mails in making representations concerning medical preparations could only be justified, if representations did not fairly exceed what defendants believed true.**

Use of mails in making representations that defendants' medical preparations would within a short time restore sexual vigor to men over 60, 70, or 80 years of age could not be justified by an honest belief that such remedies possessed some stimulative effects, but such representations, to be justified, could not fairly exceed what was believed to be actually true.

11. **Post office ☞50—Court should have instructed that defendant's refunding of purchase price of medical preparation should be considered in passing on charge of using mails to defraud.**

Though fact that defendant refunded purchase price of medical preparations to dissatisfied customers whenever demanded would not of itself require acquittal on charge of using mails to defraud by selling such preparations, trial court should have instructed jury that it was a proper matter for their consideration.

12. **Criminal law ☞1186(4)—In prosecution for using mails to defraud by selling medical preparation, errors in instructions and rulings on evidence held harmless (Jud. Code, § 269 [28 USCA § 391]).**

Where testimony fully justified conviction for using mails to defraud by selling medical

*Rehearing denied October 18, 1928.

preparation, any errors in not limiting expert opinion evidence as to actual effect of remedy, permitting evidence of financial success of scheme, and failure to instruct on question of promised refunds, *held* not to affect substantial rights of defendant, within Judicial Code, § 269 (28 USCA § 391), and did not require reversal.

In Error to the District Court of the United States for the Western District of Missouri; Merrill E. Otis, Judge.

Harold M. Stunz was convicted of using the mails to defraud in connection with selling a medical preparation, and he brings error. Affirmed.

Henry L. Jost, of Kansas City, Mo. (Fred S. Hudson and Glenn C. Weatherby, both of Kansas City, Mo., on the brief), for plaintiff in error.

S. M. Carmean, Asst. U. S. Atty., of Kansas City, Mo. (Roscoe C. Patterson, U. S. Atty., of Kansas City, Mo., on the brief), for the United States.

Before KENYON, Circuit Judge, and SYMES and MARTINEAU, District Judges

SYMES, District Judge. The defendants below, Harold M. Stunz, his wife, father, and two brothers, were jointly indicted and tried in the District Court of the United States for the Western District of Missouri, on 18 counts for fraudulent use of the mails. Counts 6, 8, and 10 were nolled. Harold M. Stunz was convicted on all the remaining counts. The other defendants were acquitted.

The first 10 counts charge the defendants with having devised a scheme to defraud, and use of the mails in connection therewith, in selling a medical preparation known as "Korex"; counts 11 to 14, inclusive, allege a similar scheme, and use of the mails, in selling a preparation called "Hiobin"; and counts 15, 16, 17, and 18 allege a fraudulent scheme to promote a so-called kidney pill, "Renex." The defendant was sentenced, and is here on writ of error.

Count 1 alleges the defendants falsely represented: That they were the owners of large and well-equipped laboratories, and that Korex, which they compounded and manufactured, was their own discovery. That it was "a scientific home treatment of superiority, as proved by wide use. A wonder treatment that restores flagging vital forces, has been perfected through many years of scientific research. This wonder home treatment is 'Korex,' a vegetable compound. * * * It contains no harmful drugs or opiates. * * * Physicians say it gives speedy satisfaction in cases that defy other treatments. Elderly people pronounce the discovery a real 'fountain of youth.' " Likewise, that it produced amazing benefits in 24 to 36 hours, and restored lost and depleted vigor, and "you can avail yourself of a discovery which men in their 60's, 70's, and 80's declare has renewed their vigor, awakened their glands, and made them 'young' again." That these statements were made with intent to deceive the public generally, and particularly any person who might receive them in the form of oral statements, circulars, letters, etc., knowing that each and all the said representations, statements, and promises were wholly false and fraudulent at the time of making the same, and that in order to carry them out they unlawfully placed and caused to be placed in the post office of the United States a certain letter, signed by the defendant, containing the said representations.

Counts 2, 3, 4, 5, 7, and 9 are similar, except that a different letter is exhibited in each. Counts 11 to 14, inclusive, contain the same general allegations in respect to the remedy Hiobin. Counts 15 to 18, inclusive, omit the alleged representations as to laboratories, etc., and charge that defendants, by oral statements, circulars, etc., falsely represented they were the distributors of Renex, which was designed to "get at the causes" of kidney, bladder, and prostate trouble, and Bright's disease; that it was a high-grade, scientific product, not a patent medicine, and would relieve and cure those particular ills, as well as liver and bowel troubles.

The trial consumed several days. The record is unusually long, the testimony being set out verbatim, contrary to the expressed wishes of this court. Marr v. U. S., 8 F.(2d) 231. The evidence in behalf of the government tended to show that in the latter part of 1921 defendants, operating from Kansas City, Mo., began to advertise the so-called "Melton Laboratories." Two years later they adopted the name Renex Company, and beginning in August, 1924, called themselves the Hiobin Company.

Korex, which was composed of yeast vitamines, extract nux vomica, yohimbin hydrochloride, and lecithin, was sold by defendants through the mails for 2½ years. It was then replaced by "Hiobin," which was exploited as a specific for the same ailments. Its ingredients were the same as

Korex, with the addition of a small quantity of iron peptonate and phenolphthalein. These preparations were at all times the property of the Stunz family, and extensively advertised. All three preparations were obtained from wholesale drug houses, nor were any laboratories of any consequence maintained. So far, the government's story is not disputed.

The government next called several reputable physicians and pharmacists of varied professional experience, who stated that in their opinions—and they were permitted to express them very freely over defendants' objections—the ingredients in question were well known in medicine, of doubtful therapeutic value, occasionally prescribed by the profession, and of some slight value as stimulants, and, finally, that these preparations were harmless, of no real or permanent value in cases of so-called lost manhood, and positively could not make the old young, sexually or otherwise; that yohimbin, the principal ingredient, and lecithin, another ingredient of both Korex and Hiobin, had been thought to be efficient in cases of functional impotency, premature senility, etc., but that this belief had, in the light of experience, been discarded several years ago.

Other evidence tended to show that Stunz was not an expert in therapeutics, and did not know of his own knowledge what the medical effect of his remedies might be in any particular case. It was admitted, however, that in some cases distinct benefits—temporary and psychological only—might be obtained by users who were in a receptive frame of mind, as a result of reading defendants' literature. Renex, the so-called kidney remedy, contained, according to the prosecution, ingredients of some slight value in kidney troubles.

Over objection of defendants, testimony was given tending to show that the business was very profitable. The use of the mails is not denied.

Defendants' medical experts stated that distinct beneficial effects resulted, if Korex and Hiobin were regularly used for the disorders indicated in the advertisements; "that they might be reasonably expected to restore sexual powers within normal limits;" that Renex was "an excellent formula for irritation of the kidneys and bladder." Numerous testimonials, solicited and unsolicited, were offered, most of which appear to be genuine.

Among the exhibits are samples of the flamboyant advertisements, circular letters,

27 F.(2d)—37

etc., put out by the defendants. This matter is most extravagant, being made up of, and consisting mostly of, statements of impossible benefits certain to follow the use of these remedies. It was represented therein that a cure would positively follow their use within a very short time, etc. Details of particular cases were given. For instance, one Glasscock—who says he was 75 years old and a mental and physical wreck—claimed to have been permanently restored to the vigor and suppleness of the prime of life. Others, that they received surprising benefits in from 24 to 48 hours, and regained the physical power they had possessed at 30 years of age, etc.

[1, 2] A difficult question is presented by defendants' motions to discharge the jury on account of newspaper articles published during the trial. The first of these was presented when the jury was completed, and refers to articles in two local papers, of November 13th and 14th, respectively. The motions were renewed on the 17th, based this time on an article published in a local evening paper of the preceding evening. Copies of the newspapers, together with affidavits of four jurors, accompanied the motions. The affiants stated that they had read the articles in question. It was also shown that various members of the jury had been seen in possession of copies.

These articles purported to outline the government's case, the methods employed in gathering the evidence, and quoted extensively from the government's opening statement to the jury. They referred to the government's side only. The only testimony printed verbatim was a reproduction in part of the advertisements admittedly carried by defendants in various newspapers. It is not claimed that the government in any way aided or encouraged these publications. The court, in denying the motions, called attention to the fact that it would hardly be practicable to discharge a jury in every case that the press might discuss or comment on during the course of the trial.

Moreover, the court on more than one occasion specifically told the jury to disregard all this, and neither in the affidavits, nor in the record, does it appear that the jury was in any way influenced thereby. Only one out of the several defendants was convicted, although all were given equal prominence in the papers. Defendants' motion was for a continuance only, and not for a change of venue to a place outside the sphere of the Kansas City newspapers, and there is no reason to believe that the treatment of the

case by the press would have been any different at a later date.

The articles in question—of the ordinary sensational type that the public is so well used to—did not express an opinion as to the guilt of the accused, nor can it be said that they would prejudice or influence persons of reasonable intelligence. Motions of this character are within the sound discretion of the court. There was no abuse in this particular case. We recognize, however, that the circumstances of a case might be such that newspaper accounts of a similar nature would render a fair trial impossible, and require the court to promptly call the offenders to account.

[3] Specifications 8 and 9 say that the court erred in permitting the government to show that the defendants had derived unusually large profits from this scheme. We fail to see the materiality of such evidence. The elements of the crime are the fraudulent scheme, intent to defraud, and the use of the mails. Pecuniary loss or profit, success or failure, or whether any one was or could actually be defrauded, are not material issues. Certainly a defendant would not be heard to say that he should be acquitted because his otherwise unlawful scheme proved unprofitable. Byron v. U. S. (C. C. A.) 273 F. 769; Linn v. U. S. (C. C. A.) 234 F. 543; Calnay v. U. S. (C. C. A.) 1 F.(2d) 926; Wine v. U. S. (8th C. C. A.) 260 F. 911; Le More v. U. S. (C. C. A.) 253 F. 887. Likewise the fact that the scheme would not have deceived one of ordinary intelligence does not relieve the wrongdoer from liability. Tucker v. U. S. (C. C. A.) 224 F. 833.

The briefs discuss at length the alleged error of the court in permitting government medical experts to give opinions said to be speculative, conjectural, and of a roving nature. These witnesses were given a great deal of leeway, and did testify generally as to whether the preparations in question would effect the cures and results claimed, and followed their categorical answers by argumentative explanations. Counsel stated that, while he did not object to expert witnesses giving their opinion, he did dispute their right to state broad conclusions, which, in effect, amounted to a decision of the issues. The court in one instance, at least, approved defendants' theory by sustaining an objection on this ground.

[4, 5] Counsel also insisted, but without avail, that many of the general questions asked required the witnesses to guess, because the questions did not embody specific facts, such as the physical condition and characteristics of the person assumed to be taking the drug, etc. The record discloses, however, that the questions objected to on this ground were based upon specific representations shown to have been actually made by defendants, were also very general, not taking into account any possible mental or physical differences of potential customers. So it was proper to permit the question and answer to be as general as the representation. It has been held that the scope of the evidence admissible to establish the scheme may be extensive in scope, and rest largely in the discretion of the trial judge. Hendrey v. U. S. (C. C. A.) 233 F. 5. Opinions and expert testimony are always admissible. Menefee v. U. S. (C. C. A.) 236 F. 826; De Camp v. U. S., 56 App. D. C. 119, 10 F.(2d) 984; Arnold v. U. S. (C. C. A.) 7 F.(2d) 867.

[6] Further, it has been held, in a case similar on the facts to the one under discussion, that, if the jury is convinced of the falsity of the representations concerning an alleged medical remedy, a conviction is justified, without proof that the article in question was worthless as a cure for disease. Moses v. U. S. (C. C. A.) 221 F. 863.

The guilt or innocence of the defendants on the merits was squarely raised by demurrer, and motion for a directed verdict at the close of the government's case, and renewed at the close of all the evidence. In support it is argued that the defendants' preparations would, and did, have the effects claimed in the circulars and advertising material; that writers and authorities of repute attributed therapeutic value and results to these remedies in accordance with the representations; and that at the most the case only presented a difference of opinion between the two sets of experts. If the record supported this premise, a reversal would be required.

[7] Medicine is not an exact science. A respectable amount of authority can be cited to dispute the value of any well recognized method of treating disease. The decision as to the efficacy of any particular remedy or drug ought not in a criminal case be left to a jury of laymen, nor can the liberty of an accused be allowed to depend solely upon the choice that a jury might make between the conflicting opinions of medical experts. The so-called quack remedy of to-day may be hailed to-morrow as an absolute cure, and vice versa. Vaccination, for instance, is believed by a large majority of the medical profession and the public to prevent small-

pox. Others, with equal sincerity, openly advocate the contrary view.

When the white man and the Indian hunted deer together, and the meat divided up, the liver, discarded by the white man, was prized by the Indian for its medical properties. To-day, it is prescribed by the medical profession as a certain cure for pernicious anemia. Not many years ago the so-called Chinese herb doctors were prosecuted under this identical statute for representing that portions of dried fish—especially the head—were a cure for heart trouble. It is now established that adrenalin—which can be obtained from certain kinds of fish, is a powerful heart stimulant. Many other illustrations could be given—all to the point which we wish to emphasize—that a conviction in a case such as this must be bottomed on something more than conflicting opinion evidence. Bruce v. U. S. (C. C. A.) 202 F. 98. Compare, also, American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 S. Ct. 33, 47 L. Ed. 90.

We are of the opinion, however, that the instant case does not turn on any such question. That counsel for appellant recognizes this is shown by their statement that, in considering the circular and advertisements, they must first be "stripped of its figurative language and numerous exaggerated or puffed statements, as it should be, and as the trial court charged, and stripped also of its absurd and ridiculous statements, such as that it made men of from 60 to 80 years old as good as new," etc. But the parts that counsel would now exclude from our consideration form the gravamen of the offense charged in the indictment. Giving the evidence on behalf of the defendants the full effect claimed, it does not support the representations made by them.

[8] It is quite evident that the language used was designed to, and no doubt did, make a very strong appeal to those suffering from the ills described. For instance, there is no justification for the representation that Korex and Hiobin would within a short time restore to a man of 60, 70, or 80 years of age the sexual vigor that he possessed at the age of 30. The literature is couched in terms of high-powered salesmanship, as distinguished from language ordinarily used to express one's sober conviction of the truth. Granting everything that counsel say, the jury were justified in finding the representations to be either knowingly false, or made with reckless disregard as to whether they were true or false. Ei-

ther is sufficient. Corliss v. U. S. (8th C. C. A.) 7 F.(2d) 455.

[9, 10] That the fraud or deception may be by implications reasonably derived therefrom by the reader, as well as by express words, see Harrison v. U. S. (C. C. A.) 200 F. 662. Moreover, the jury were instructed that, even though the representations were false, the defendant was not guilty if he believed them to be true when made. But, as the court very properly went on to say, the specific statement referred to could not be justified by an honest belief that these remedies possessed some stimulative effects. The representations must not fairly exceed what is believed to be actually true.

[11] Defendant charges error in the failure of the court to give requested instruction No. 5, to the effect that, if the jury find from the evidence that the defendant made the representations charged under the promise and guaranty to refund, and if they believe from the evidence that the defendant did repay such purchase price to customers not satisfied whenever demanded—so far as such demands came to the attention of defendant—then under such circumstances there was no use of the mails with intent to defraud, and the defendant should be acquitted.

The government justifies this refusal by citing McLendon v. U. S. (C. C. A.) 13 F. (2d) 777. The refusal to give a similar instruction in that case, however, turned, as stated in the opinion, on the particular facts thereof. A good discussion of the point is found in Harrison v. U. S. (C. C. A.) 200 F. 662, supra. While the fact of refund, if established, would not of itself, as the refused instruction states, require an acquittal, nevertheless, under the circumstances here presented, we would be better satisfied, had the court instructed the jury that it was a proper matter for their consideration.

[12] We are of the opinion that the great weight of the testimony fully justified—if it did not compel—the verdict rendered. We therefore conclude that whatever error there may have been in not limiting to some extent, at least, the so-called opinion evidence, in permitting evidence of the financial success of the scheme, and the failure to give an instruction on the question of promised refunds, the substantial rights of the defendant were not affected. Section 269 of the Judicial Code (Tit. 28, § 391, USCA); Heglin v. U. S. (8th C. C. A.) 27 F.(2d) 310.

The judgment is affirmed.