## BECK v. UNITED STATES.

Circuit Court of Appeals, Eighth Circuit.
May 11, 1929.

No. 7993.

Charles P. Williams, of St. Louis, Mo. (N. C. Whaley, of St. Louis, Mo., on the brief), for plaintiff in error.

C. J. Stattler, Asst. U. S. Atty., of St. Louis, Mo. (Louis H. Breuer, U. S. Atty., of Rolla, Mo., on the brief), for the United States.

Before LEWIS, Circuit Judge, and WOODROUGH and McDERMOTT, District Judges.

McDERMOTT, District Judge. The plaintiff in error (hereafter called the defendant) was a real estate operator in St. Louis, of good character and standing. He conceived the idea of building houses for those desiring homes, letting the purchaser select his lot and general plan of his house. The idea consisted of doing this in a wholesale way; employing a staff of competent architects working on a salary instead of a percentage; employing competent builders to supervise the construction, on a salary instead of a percentage; eliminating subcontractors' profits by direct installation; purchasing materials in wholesale quantities instead of at retail. He believed such a plan would eliminate a considerable part of the duplicated percentage profits encountered by the man who builds on his own, and save a part, at least, of the retail materialman's profit; a saving which could be divided between him and his clients. The plan is in use by many companies, sometimes affiliated with building and loan associations. The client was to advance 10 per cent. or more of the estimated cost; 60 per cent. could be financed through insurance companies or almost any financial channel; the balance to be carried on a second mortgage, for which the market is more limited.

For such purposes he formed a corporation, called the Federal Home Building Corporation, of $25,000 authorized capital. Beck was the president, and one Edward J. Barrett was first a salesman, later sales manager, and then general manager. When the spring opened in 1923, the campaign was launched; advertisements were carried in the St. Louis papers, and salesmen employed. The response was immediate, and, in fact, overwhelming. By late July about 355 contracts had been entered into; about $266,000 was advanced by contract holders; construction of 47 houses was under way, and two of them were practically complete; others were in the course of settling the plans and specifications. It appears that mortgages cannot be floated until the roof is on, and there is no evidence that money, in any appreciable degree at least, had started coming in from the proposed financing, although many of the houses were rapidly approaching the stage when mortgages could be floated. A force of ten or more architects and draftsmen were busily engaged; the labor payroll had reached $9,000 a week; much material had been purchased and paid for. Without any preliminary warning, a contract holder applied for and obtained a receiver; nothing much was salvaged, and the contract holders lost heavily.

In April and May certain letters, set out in the indictment, and purporting to be signed by Barrett, were received through the mail by contract holders. These letters are in themselves inoffensive, notifying a contract holder of acceptance of his contract, or calling for a payment, or making an appointment. Beck turned over to the receiver, from his personal funds, $10,000 in cash for the purpose of an audit; turned over to voluntary trustees for the contract holders trust deeds of a face value of about $43,000, and his equity in certain real estate valued by him at more than $100,000. There was dissension among the contract holders; the deeds of trust were sold by the trustees at a 20 per cent. discount, and the $32,000 cash received is not clearly accounted for, unless it was applied on mortgages on the real estate turned over, which the trustees now say is worse than worthless. At any rate, the $43,000 of securities is gone, which perhaps accounts for the dissension.

In December, 1925, the defendant, Barrett, and four others were indicted under section 215 of the Penal Code (18 USCA § 338) for wrongful use of the mails. There were two trials. On the first trial, the defendants other than Beck and Barrett were dismissed out of the case; the jury convicted Barrett, and disagreed as to Beck. Beck was convicted on the second trial; was sentenced to three years in the federal penitentiary and to pay a fine of $1,000. This appeal follows.

Various assignments of error are urged, the principal ones of which will be discussed. One of them challenges the sufficiency of the proof. Knowing that this would require an examination of the entire record of this ten days' trial, counsel have made no effort to lighten the labors of the court by a narrative statement of the evidence, although the mat-

ter has been called to the attention of the bar many times. Stunz v. U. S. (C. C. A.) 27 F.(2d) 575; Marr v. U. S. (C. C. A.) 8 F.(2d) 231. The case at bar is peculiarly aggravated. A great many contracts were introduced in evidence; counsel must have known they were identical, except as to name and amount; but this court did not know it, and must read the same contract again and again, all printed in full; long leases for office rooms are copied verbatim, although only the dates and amounts are important. An auditor was put on the stand to show the total receipts of the company, the totals expended in construction, in commissions, in salaries, in advertising, etc. Yet 88 printed pages of cross-examination, as to $5 checks and the like, are in the record, to say nothing of pages of bank records and checks read into the record and not even listed. The court's admonitions to the jury on each separation are carefully preserved for our judicial review, although no error is predicated thereon. If in this garbled mass of irrelevant detail there should be a kernel of fact overlooked by the court, counsel are not in position to complain. Such practice is a totally unnecessary drain on the resources of the client who pays the bills. To counsel who may be interested, reference is made to Barber Asphalt Paving Co. v. Standard Asphalt & Rubber Co., 275 U. S. 373, 48 S. Ct. 183, 72 L. Ed. 318, where the court ordered a new transcript printed, and assessed the offending attorneys $5,000 for their error; and to Fairbanks, Morse & Co. v. American Valve & Meter Co., 276 U. S. 305, 48 S. Ct. 317, 72 L. Ed. 737.

1. *The Indictment.* The indictment was originally in ten counts. The first count set out a scheme to obtain money by false pretenses; counts 2 to 9 set out the mailing of the letters, incorporating the allegations of the first count by reference; the tenth count charges a conspiracy to violate section 215, incorporating by reference the allegations of the first count.

The tenth count was dismissed before submission to the jury on the first trial. Eight of the remaining counts allege the mailing of the letters; incorporate by reference the averments of the first count; and allege that such letters were mailed for the purpose of executing the scheme set out in the first count. We turn then to the first count to find the charge relied upon.

Section 215 defines several crimes, among them a "scheme or artifice * * * for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." The indictment alleges, in part, that the defendants, "having devised and intended to devise a scheme to obtain money and property by means of false and fraudulent pretenses, representations and promises from numerous and sundry persons including the public generally and particularly those, who by the means hereinafter described, could be induced to give, pay and send their money and property to said defendants under the name of Federal Home Building Corporation, a corporation organized and existing under the laws of the State of Missouri, and at all times mentioned herein under the management and control of said defendants, for subscribing for and purchasing contracts with said defendants under the name of Federal Home Building Corporation, all of said persons being hereinafter referred to as the persons to be defrauded, and all of said persons residing within the territorial limits of the United States, and which said scheme to obtain money and property by means of false and fraudulent pretenses, representations and promises was in substance and effect as follows, to-wit."

There follows five printed pages of "representations," all of which are alleged in the most general terms to be false and untrue. It is not alleged wherein they are false. It is true, as claimed by appellant, that there are many instances where, in order to comply with the constitutional requirement of certainty in the accusation, a pleader should not only allege the falsity of the misrepresentation, but "allege affirmatively in what the falsehood consisted." 25 C. J. 628. But the particular vice of this indictment reaches farther than that; the unfair part of it is that the defendant is charged with falsely representing many things which counsel for the government assure the court are not false at all. For example, the indictment solemnly charges the defendant with falsely asserting that he had a "workable plan"; it charges as false the representations that the corporation could build cheaper, could save middlemen's expense, and could build on a small down payment; yet, on argument, the government assures that the plan failed because it was underfinanced. Other representations are charged as false, which the evidence showed were true. It is possible that the government believed these representations were false when the case was presented to the grand jury, although the presence of other allegations indicates the possibility, at least, that the government charged misrepresentations without much regard to whether the evidence would support them. This possibil-

ity is strengthened by the presence of a clause which is aptly described on argument as the "shotgun" clause. It reads: "That the defendants, and each of them, under the name of Federal Home Building Corporation, fraudulently and knowingly did make and cause to be made by personal statements and representations of agents and representatives and through printed advertisements and printed and written letters and communications sent through the Post Office Establishment of the United States, false and fraudulent pretenses, representations and promises with reckless disregard as to whether the same were true or false and did make glittering, alluring, laudatory, attractive and specious predictions, representations and promises with a reckless disregard as to whether same were true or false and possible of fulfillment concerning the Federal Home Building Corporation, its assets, worth and value, actual and potential, the use of the proceeds of the sale of the contracts and of financing the said Federal Home Building Corporation and its officers, and especially the defendants, as experienced men in the building and contracting business and as to their ability and qualifications to manage and operate the business of the Federal Home Building Corporation to the best advantage and ability to purchase materials cheaper and to greater advantage than other building contractors, and the production and delivery of completed buildings to contract holders and their system of employing labor and mechanics."

Then follows an allegation that the corporation spent too much money; and there is an earlier allegation that the corporation maintained elaborate and luxuriantly furnished offices, supported later by evidence that there were draperies at the windows and leather chairs in the offices. What these allegations have to do with false representations is not clear.

The indictment was attacked generally. While it is not directly charged that the defendants devised any scheme, the allegation that the defendants "having devised," etc., such scheme is sufficient to advise the defendants of the charge and to protect them against a later charge.

The quoted "shotgun" clause is in such general terms that it is unfair to the defendants. It gives them no inkling of what facts may be concealed in the underbrush of glittering generality, and no opportunity to defend against them. The courts are properly lenient with regard to the form of an indictment which substantially advises the defendant of the charge; they are likewise critical of a charge which is that in form alone, and can serve no purpose save as a foundation for evidence that will catch the defendant off his guard. In the early history of civil pleading, plaintiffs used to allege certain acts of negligence, and then quietly add "on account of the aforesaid and *other* negligent acts." Occasionally it is still done; but not when a court's attention is directed thereto. The Constitution compels that the rule of criminal pleading should be at least as fair. A trial judge would be justified in sustaining a demurrer to an indictment with such Mother Hubbard allegations; or in treating it as surplusage. In this case, neither course was taken. A motion for a bill of particulars was asked and denied. While such a motion is generally within the sound discretion of the court, it should have been sustained.

The indictment, however, does allege certain specific misrepresentations, which advise the defendant sufficiently of the charge, without the necessity of any affirmative allegation as to wherein they are false. These are: That the capital was fully paid up; that the corporation was being financed by certain life insurance companies; that it had financial backing arranged for in certain large sums; that it had contracted with the Southern Surety Company for completion and lien bonds; that it had contracted for the entire output of brick factories; and perhaps one or two other matters. The appellant urges that these allegations, concededly sufficient, are so obscured by a cloud of other allegations that are either insufficient or unsupported by the evidence that the defendant was confused and misled as to the real charges the government had in mind, and he was denied a fair trial. During the World War, the most effective camouflage for a battery of field artillery was to place it in the open, surrounded by many dummy batteries; and often the most effective hiding place is in a crowd. There is, however, another principle of law which holds that surplusage in an indictment may be disregarded. Mathews v. U. S., 15 F.(2d) 139 (8 C. C. A.). That case, it is true, dealt with surplusage incident to the main charge, and did not mislead. The surplusage in the present indictment is collateral to the charges well pleaded, and may have misled. This situation can be remedied by the court, upon proper motion sufficiently in advance of the trial, determining what misrepresentations the defendant will be required to meet on the trial.

2. *The Sufficiency of the Evidence.* The defendant earnestly urges that the evidence affords no foundation for criminal responsi-

bility; that, at most, it shows a sound scheme, underfinanced, shattered on the rocks of receivership. The government concedes the soundness of the scheme; its own witnesses approved it. The district attorney contends that it early became apparent the corporation could not meet the obligations it was assuming, that it was without funds itself, and had made no arrangement to obtain them, and thence the whole plan became a fraudulent scheme.

We have examined the record as carefully as its condition permits to ascertain if there is any substantial evidence to support the contention.

██ That the mails were used is clear. That the defendant Beck is bound if Barrett used the mails in the ordinary course is not open to serious dispute. The law does not now require an intent to use the mails as part of the scheme, as formerly. It is sufficient if they are used. Beck placed Barrett in the position of general manager of the corporation, leaving to him the direct management of the business while Beck primarily looked after his own business. Beck employed and paid stenographers, which shows a contemplated use of the mails. Aside from the fact that the letters purport to bear Barrett's signature, the record is barren of proof that he signed them or mailed them. This is insufficient to bind either Barrett or Beck. In a similar case, our court has said:

"There is no direct evidence that defendants wrote the letters or that they deposited them in the post office directed to Mergen with postage prepaid, or that they otherwise caused them to be delivered to Mergen through the mails. The envelopes in which the letters were mailed are not in the record and apparently were not introduced in evidence. The genuineness of the purported signatures to the letters does not appear to have been directly established. The fact that the defendants caused such letters to be delivered to Mergen through the post office at Beloit, Kan., must be inferred, if at all, from the fact that the letters purport to have been written either by McClintock or by Brady, that the letters are addressed to Mergen at Beloit, Kan., and that Mergen testified he received such letters through the mail. To sustain the judgment, we must hold that the jury were warranted in presuming from this evidence, and this evidence alone: First, that the letters were inclosed in envelopes addressed to Mergen at Beloit, Kan.; second, that the defendants caused the letters to be duly stamped and mailed; and, third, that the post office at Beloit, Kan., received them

and delivered them to Mergen. To do this, we would have to permit presumption to be built upon presumption. From the fact that the letters contained in themselves the address of L. A. Mergen, Beloit, Kan., the presumption would have to be drawn that they were enveloped, properly stamped, and addressed to Mergen at Beloit, Kan. From this presumption, the presumption would have to be raised that the defendant Brady caused them to be mailed, so addressed, and from the last presumption the presumption would have to be drawn that the post office establishment delivered them at Beloit, Kan., to Mergen. It is well settled that presumptions cannot be based on presumptions. Vernon v. U. S. (C. C. A. 8) 146 F. 121, 126; 22 C. J. p. 84, Sec. 27, page 99, Sec. 40. We conclude that the evidence was insufficient to support the verdicts of guilty. See Freeman v. U. S. (C. C. A. 3) 20 F.(2d) 748." Brady v. U. S. (C. C. A.) 24 F.(2d) 399, at page 403.

There is some evidence of misrepresentation, or of false "promises," by Beck, and by Barrett, whose acts could, under the circumstances, be found by the jury to be the acts of Beck. One witness testified that Mr. Beck told him "that he had the financial backing of the Metropolitan Life Insurance Co., that they intended taking his loans to the amount of three million dollars"; and that surety bonds would be furnished for all buildings just before construction was commenced on any particular house.

Defendant urges that the scheme was sound, and the government admits it. This alone does not answer the question. A sound scheme, in the hands of a criminal, is more dangerous than an unsound one; a plausible plan is better bait than one inherently improbable. Did Beck and those working with him realize the corporation could not carry out its contracts, and then decide to use the plan for the fraudulent purpose charged, or did they in good faith believe they would get the necessary financing? That is the issue. If the defendant started out in good faith, as the district attorney admits, but later became criminal in his intent, did that change take place prior to the mailing of the letters?

The record shows heavy expenditures for advertising; a considerable force of salesmen; the payment to Beck and Barrett of considerable sums in excess of their commissions; the construction of houses for them with company money offset by a charge to their account; a stock dividend of $5,000; no proof that the capital was paid in; the sale of houses for less than cost; familiar

prizes to stimulate the salesmen. The government points to the large losses following the receivership, and contends that the houses built were but bait for more victims; that, conceding, as it does, that the plan was honest in its inception, it was early turned into a plan to sell contracts instead of homes, and keep the money.

On the other hand, it is admitted that very large sums were expended for lumber and brick; that a large force of architects and draftsmen were busily engaged; that 47 houses were started; that the pay roll rose to $9,000 a week, and competent experienced men were employed by the corporation. That is not the way of the dishonest promoter. According to the government's theory, the promoters expended by far the greater proportion of their receipts for brick and labor and printer's ink. The defendant claims that the receivership came in that darkest hour that precedes the dawn, just when houses were getting to the point in construction where deeds of trust could be floated, and that it could not weather the receivership. It is pointed out that most business concerns show an impairment of the surplus at the beginning; that there is an initial inertia to overcome, and that losses are more apt to occur in the early days before they find their bearings; that the plan was too attractive, and too much business was written for their capital. In fact, in argument, the government concedes that the failure occurred because of insufficient financing.

■ Upon appeal, all reasonable intendments should be drawn to support the verdict; but, when all is said and done, the rule quoted in Bishop v. United States (C. C. A.) 16 F.(2d) 410, is still the law, that, where circumstances are relied upon, they should be such as to exclude any reasonable hypothesis of innocence. From the printed page there is serious question whether the government proved any criminal plan. If the plan shaded from an honest to a dishonest one, the time it crossed the line is not shown by the record. However, in such matters as these, particularly where the state of a man's mind must be established, the trial court's responsibility is the heavy one. Not only has he had the opportunity of observing the witnesses on the stand, but he has patiently listened to this evidence twice, and has approved the verdict. In a case as close as this one upon the facts, and since the evidence may not be the same upon another trial, there is no occasion for this court to further analyze the evidence, as it was called upon to do in Bishop v. U. S., supra.

■ 3. *The Admission of Evidence.* (a) Over repeated and vigorous objection, the court admitted evidence of conversations between a great many contract holders and a number of salesmen employed by the company, not had in the presence of Beck and not shown to have been authorized by him. The court announced, early in the trial, the theory on which the case was tried:

"But the ruling of the court is, what Mr. Barrett may have said or what the officers of the company of which he was president may have said, in the discharge of their duties in connection with that company, are binding upon the defendant."

This ruling was upon the evidence of one Shea, who was not an officer but a salesman, and was adhered to throughout the trial.

In our opinion, this was error; if error, it was highly prejudicial, for the recollections of a procession of contract holders, mostly women, who had lost their money, of oral promises and representations made some four years before, were lurid and vivid. Guilt is personal and not vicarious. Except for certain regulatory offenses not involving moral turpitude, it has always been an axiom of the criminal law that criminal intent is an essential ingredient of crime. It must be true that no man can be held liable for a false pretense or promise if he neither made the pretense nor authorized it. It is doubtful as to whether the corporation could be held civilly for unauthorized and unratified promises of a salesman; it is more doubtful whether the president could be personally held; those questions need not be discussed, for the doctrine of respondeat superior that sometimes holds a principal for representations he neither authorized nor ratified, expressly or impliedly, is a doctrine of civil liability, and not of criminal responsibility. Material representations made by Barrett in the presence of Beck, or by others authorized by Beck to make them, are competent; evidence that *such* representations were used in securing money from contract holders is competent. But the trial proceeded on the theory stated by the court that any representation made by those employed by the company was competent, irrespective of Beck's knowledge, authority, or ratification; and this was error. There was much evidence of that kind; e. g., contract holders testified that sales agents promised their houses would be completed in so many days, and there was no proof that Beck authorized the promise or ever knew it had been made. And as to some of these material was on the ground and work begun prior to receiver-

ship. This testimony seems to be prejudicial as well as immaterial.

■ (b) *The Books of Account.* It was proper for the government to prove the amount of money received by the company from its contract holders, and where it went. It would seem that, if the expenditures were divided into the totals paid on construction, for advertising, for salesmen's commissions, to the defendants, and perhaps other general classifications, it would be sufficient. Much, if not all, of this could be gathered from the records of the bank, from canceled checks, or authenticated check stubs. An auditor was called; he said the books were incomplete; and he had gathered certain data from interviews with contract holders and others. The books were the only account books found in the office of the company. A former bookkeeper was called who identified probably 10 per cent. of the entries.

The records of the bank were sufficiently identified, and the canceled checks. The objection to the books being incomplete is not sound; it has been properly ruled that a defendant cannot object to his own books because they are fragmentary. The use of an auditor is commendable and often necessary to any clear comprehension of the facts. The auditor may not, however, testify to conclusions drawn from unsworn statements made to him by others. A negative—such as that the capital was not paid in—can be testified to without the introduction of books; that is, a competent auditor may testify that the records found in the company's office, or its bank account, does not disclose the payment of capital, if he can so testify. After evidence of the moneys coming into the corporation is shown, either from the contracts themselves or the bank account, an auditor may testify that the only record of its expenditure is that shown by the books, and, if the defendant then objects, the matter can be safely left. These books, however, were not identified in accordance with the rule laid down by this court in Phillips v. U. S. (C. C. A.) 201 F. 259, where the records of a national bank, identified by its city manager, were excluded. The court concluded a long summary of the cases by saying:

"If this rule obtains in civil cases, it should not be relaxed in criminal cases. It results, therefore, that the books of the Hanover National Bank were improperly admitted in evidence, in the absence of the testimony of some person who either had some knowledge of the correctness of the entries made, or some knowledge of the original transaction upon which the entries were founded, and in the absence of testimony showing that the person or persons who possessed such knowledge were either dead, insane, or beyond the jurisdiction of the court."

■ This rule has been recently applied in Hagan Coal Mines v. New State Coal Co., 30 F.(2d) 92 (8 C. C. A.). Before the books are admissible in this case, there should be some showing, by competent evidence, that the entries therein are correct, and reflect, as far as they purport to do so, the true condition of the corporation, or its activities.

(c) *The Draperies and Leather Chairs.* The government called witnesses to prove that there were draperies in the office of the company, and that the defendant had a leather office chair; also that some of the personnel of the company went to the races at Louisville, at the expense of the company, as a prize for selling the most contracts. This evidence was introduced to support the allegation of the indictment of "elaborate and luxuriantly furnished offices in the Tower Building," and that the corporation expended its moneys "with reckless disregard to the rights and interests of the said persons to be defrauded." The complaint being that money was obtained by a false pretense, just why these allegations appeared in the indictment was not clear to this court until the record of the closing argument to the jury was examined.

4. *Misconduct of Counsel.* The record of the former trial discloses that the following occurred:

"Mr. Carroll: I object to that, if the Court please.

"The Court: Sustained.

"Mr. Carroll: I think counsel knows better than that. It is intended for no other purpose than the purpose of prejudicing this jury.

"Mr. Stattler: I admit it."

No such admission was made upon the present trial, but none is necessary. Res ipsa loquitur. The reason why the witness was called to testify to the leather chair appears in the closing argument to the jury:

"Look at this Sittner contract. That is the contract Beck sold, personally, for which he collected $1035.00. That is the case where he told of all these banks, insurance companies, and all the money they had. That is the case where he sat back in his leather chair and robbed this woman of that $1,035.00."

An objection was sustained to the use of the word "robbed"; but that did not dampen

the ardor of counsel for long. A little later:

"Mr. Stattler: * * * I say you ought to say to Mr. Beck—you cannot make a sewer out of the United States Mail; you cannot use the arm of the United States Government for the purpose of defrauding; you cannot use the United States Mail to pray upon the yearning of the American people for a home; you cannot use the United States Mail for the purpose of robbing the widow and the orphan of their hard earned savings.

"Mr. Oliver: Now, we object to that language and argument, as to robbing widows and orphans of any money. No testimony on that in this case, and ask that the Court rebuke counsel.

"The Court: Sustain the objection to the word 'robbery.'"

The reason for evidence as to particular items in the books likewise appears:

"Mr. Stattler: —using funds of the Corporation to purchase automobiles for his own private use—he did not tell you that, now.

"Mr. Oliver: We object to that, now. That is not in evidence in this case.

"The Court: Sustained."

But again perseverance predominated. He came back to a check he had no right to comment upon. So he did not. He said:

"—here is the one I want—The Packard Motor Company. He paid $2,100.00 for an automobile; the testimony don't show to whom that automobile went. I wish I could tell you—"

The same attitude of counsel is exhibited in the manner of examining witnesses. For example, a witness on direct examination would testify that Mr. Barrett, or some one else, made a certain statement. Counsel would then ask, "Was Mr. Beck in the room?" The witness answered, "He was there sometimes." Counsel would then ask, "Did *they* tell you?" so and so, leaving a direct impression that Mr. Beck made the representations, an impression not intended by the witness.

 Reasonable allowance must be made for the heat of battle, and very wide discretion vested in the trial court. In view of the allegations of the indictment as to "the elaborate and luxuriantly furnished offices,"

in view of the witnesses called to testify as to the draperies at the windows and the leather in the chairs, it may be that these improper arguments cannot be all charged to the heat of battle. In any event, there is no excuse for offending twice, after the court has ruled upon the matter. A trial in the United States court is a serious effort to ascertain the truth; atmosphere should not displace evidence; passion and prejudice are not aids in ascertaining the truth, and studied efforts to arouse them cannot be countenanced; the ascertainment of the truth, to the end that the law may be fearlessly enforced, without fear or favor, and that all men shall have a fair trial, is of greater value to society than a record for convictions.

The Supreme Court of the United States has very recently reversed a case because of improper argument by counsel. Although the case was one to which the government was not a party, the court spoke in strong language:

"But a trial in court is never, as respondents in their brief argue this one was, 'purely a private controversy * * * of no importance to the public.' The State, whose interest it is the duty of court and counsel alike to uphold, is concerned that every litigation be fairly and impartially conducted and that verdicts of juries be rendered only on the issues made by the pleadings and the evidence. The public interest requires that the court of its own motion, as is its power and duty, protect suitors in their right to a verdict, uninfluenced by the appeals of counsel to passion or prejudice. See Union Pac. Ry. Co. v. Field (C. C. A.) 137 F. 14, 15; Brown v. Swineford, 44 Wis. 282, 293 (28 Am. Rep. 582). Where such paramount considerations are involved, the failure of counsel to particularize an exception will not preclude this Court from correcting the error. Brasfield v. United States, 272 U. S. 448, 450, 47 S. Ct. 135 (71 L. Ed. 345)." New York Cent. R. Co. v. Johnson (No. 455, Apr. 8, 1929) 49 S. Ct. 300, 73 L. Ed. ——.

The conduct of this case, in itself, requires a reversal, under this decision. The case will be reversed and remanded for a new trial.